MARK D. FREEMAN, ESQUIRE
PO Box 457
Media, PA  19063
(610) 828-1525                                    Attorney for Plaintiffs
_____
                                              :
Dennis Starkey                                :
227 Dew Drop Rd.                              :
York, PA 17403                                :
                                              :
Jacquelyn Starkey                             :
227 Dew Drop Rd.                              :
York, PA 17403                                :
                                              :
A.S., a minor,                                :
M.S., a minor                                 :       UNITED STATES
                                              :       DISTRICT COURT FOR THE
          Plaintiffs                          :       MIDDLE DISTRICT OF
                    v.                        :       PENNSYLVANIA
York County                                   :       Civil Action No. 1:11-CV-0981
28 East Market St.                            :
York, PA 17401-1588                           :       Hon. John E. Jones, III
                                              :
York County Office of Children,               :
       Youth and Families                     :       JURY TRIAL DEMANDED
100 West Market St., Suite 402                :
York, PA 17401                                :
                                              :       AMENDED COMPLAINT
Deb Chronister                                :
100 West Market St., Suite 402                :
York, PA 17401                                :
                                              :
Joan Hedgcock                                 :
100 West Market St., Suite 402                :
York, PA 17401                                :
                                              :
Katie Gladfelter-Watts                        :
100 West Market St., Suite 402                :
York, PA 17401                                :
                                              :
Patricia Niederer                             :
100 West Market St., Suite 402                :
York, PA 17401                                :
                                              :
          Defendants                          :
_____              :

Plaintiffs, Dennis Starkey, Jacquelyn Starkey, M.S. and A.S. allege the following:

## JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and the Fourth, Fifth and Fourteenth Amendment of the Constitution of the United States.

2.      The jurisdiction of the Court is predicated on 28 U.S.C. § 1343(a),(1), (2), (3) and (4) and 28 U.S.C. § 1331.

## ALLEGATIONS-PARTIES

3.      Plaintiff, Dennis Starkey, hereinafter "Dennis" is and at all relevant times was a resident of York County, Pennsylvania.  Dennis was coerced into a "voluntary" agreement to leave his own home and children as part of a safety plan agreed to under the threat of a court order that would grant legal custody of his children to the York County Children Youth and Families agency and was the subject of a knowingly false "indicated" report to Childline.

4.      Plaintiff, Jacquelyn Starkey, hereinafter "Jackie" is and at all relevant times was a resident of York County, Pennsylvania. Jackie was coerced into a "voluntary" agreement to leave her own home and children as part of a safety plan agreed to under the threat of a court order that would grant legal custody of his children to the York County Children Youth and Families agency and was the subject of a knowingly false "indicated" report to Childline.

5.      Plaintiff, M.S., a minor, is the first child of Dennis and Jackie, was born in 2007 and at all relevant times was a resident of York County, Pennsylvania.

6.      Plaintiff, A.S., a minor, is the second child of Dennis and Jackie, was born in 2010 and at all relevant times was a resident of York County, Pennsylvania.

7.     Defendant York County is a political subdivision of the Commonwealth of Pennsylvania run by a governing body of three commissioners.  Defendants, M. Steve Chronister, Chistopher B. Reilly and Doug Hoke, are sued in their official capacity as Commissioners of York County.  The Commissioners of York County are licensed by the Commonwealth of Pennsylvania pursuant to 55 Pa. Code Chapter 3130 to operate a county agency for the purpose of administration of County Children and Youth Services and Other Supplementary Program Regulations under license number 315970 for the period of October 1, 2010 through July 1, 2011.  Defendant York County and Defendants M. Steve Chronister, Christopher B. Reilly are hereinafter collectively referred to as "York County."

8.     Defendant York County Office of Children, Youth and Families, (hereinafter "YCOCYF") is the licensee of the Commonwealth of Pennsylvania's Department of Public Welfare in York County charged with setting polices to enforce and follow Pennsylvania law regarding how to conduct an investigation of suspected child abuse and protect children while upholding the procedural and substantive due process rights of parents and children. Defendant YCOCYF's policies for child abuse investigation and child protection either failed to adequately protect the substantive and procedural due process rights of parents and children or, alternatively, YCOCYF's policies were sufficient to protect the substantive and procedural due process rights of parents but YCOCYF failed to adequately train and/or supervise its employees regarding the policies.

9.     Defendant Deb Chronister is a citizen of Pennsylvania and at all relevant times held the position of executive director of YCOCYF, is a defendant in her personal capacity and in her capacity as administrator.  At all times relevant herein, Defendant Chronister had a non-delegable duty to set agency policies and to ensure the adequate training of YCOCYF

employees regarding how to conduct an investigation of suspected child abuse and protect children in accordance with Pennsylvania law while upholding the procedural and substantive due process rights of parents and children.

10.     Defendant Joan Hedgcock is a citizen of Pennsylvania and at all relevant times held the position of supervisor at YCOCYF, is a defendant in her individual capacity and her capacity as supervisor at YCOCYF.  At all times relevant herein, Joan Hedgcock had a non-delegable duty to follow the policies of YCOCYF and to ensure that the employees under her supervision were adequately trained and supervised to follow the policies of YCOCYF concerning how to conduct an investigation of suspected child abuse and protect children in accordance with Pennsylvania law while upholding the procedural and substantive due process rights of parents and children.

11.     Defendant Katie Gladfelter-Watts is a citizen of Pennsylvania and at all relevant times held the position of case worker at YCOCYF, is a defendant in her individual capacity and her capacity as case worker.  At all times relevant herein, Katie Gladfelter-Watts had a duty to follow the policies of YCOCYF concerning how to conduct an investigation of suspected child abuse and protect children and to follow Pennsylvania law while upholding the procedural and substantive due process rights of parents and children.

## ALLEGATIONS - FACTUAL

12.     In August of 2010, Dennis was employed by Becton Dickinson Diagnostic Systems as a Material Handler for the third shift specifically for the purpose that the Starkey children would not have to go to daycare.

13.     In August of 2010, Jackie was employed by Becton Dickinson Diagnostic Systems as a Quality Engineer and Supervisor and coordinated her work schedule with Dennis so that the Starkey children would not have to go to daycare.

14.     Dennis and Jackie were married on April 29, 2006.  It was the first marriage for both Dennis and Jackie   Prior to their marriage neither Dennis nor Jackie had any children.

15.     M.S., the Starkey family's first child, was born in August of 2007 and was 3 years old at all times relevant to this complaint.  A.S., the Starkey's second child, was born in February of 2010.

16.     On August 21, 2010 A.S. was nearly six months old and at home when he bumped his head on the floor while playing.  A.S. began to fuss and Dennis picked A.S. up to console him.  A.S. quieted down for a few minutes and then went limp.  Dennis and Jackie took A.S. to Memorial Hospital immediately.

17.     At Memorial Hospital a CT scan revealed that A.S. had sustained small subdural hemorrhages as a result of his bump on the head.   A.S. was transported to Hershey Medical Center for further workup.  A.S. was also observed to have retinal hemorrhages.

18.     Blood work on A.S. demonstrated that he had a low protein C level, a known risk factor for abnormal clotting.

19.     Upon information and belief, on August 22, 2010, a report of suspected child abuse was made to Childline and/or YCOCYF as a result of the presence of subdural and retinal hemorrhage in A.S.  There was no bruising anywhere on A.S.'s body, a full body skeletal series of x-rays revealed no fractures on A.S.'s skull, ribs, arms legs or on any other bone, there was no

scalp swelling, and there was no injury to A.S.'s brain whatsoever. The only medical finding was that of small subdural hemorrhages and retinal hemorrhages.

20.     It is well recognized in the medical literature that subdural and retinal hemorrhages have a wide variety of natural and non-abusive causes.

21.     Defendant Hedgcock and Defendant Gladfelter-Watts contacted Dennis and Jackie and informed them that because of the report of the presence of subdural and retinal hemorrhages in A.S., if Dennis and Jackie did not enter into a "voluntary" safety plan with which YCOCYF agreed, that YCOCYF would seek an emergency custody order from the York County Court of Common Pleas to place A.S. and M.S. into foster care.

22.     Dr. Dias, A.S.'s treating physician at Hershey Medical Center and the head of the Hershey Medical Center child abuse safety team, identified the Discharge Diagnosis for A.S. as "bilateral subdural hemorrhage" and "bilateral retinal hemorrhage." Nowhere in Dr. Dias' discharge diagnosis, or anywhere else in A.S.'s medical records, is a diagnosis of "shaken baby syndrome" or child abuse found.

23.     On August 24, 2010, under Defendant Hedgcock's and Defendant Gladfelter-Watts' threat of obtaining an emergency court order to place A.S. and M.S. into foster care, Dennis and Jackie agreed to move out of their home and Olympia Starkey, Dennis's mother, agreed to move into the Starkey family home to care for the children in the children's own home under the terms of a "voluntary" safety plan proposed by YCOCYF on the form used by YCOCYF for "voluntary" safety plans.

24.     Placement of the children with Olympia Starkey, the children's paternal grandmother, was contingent upon an emergency caregiver investigation by YCOCYF and was a

voluntary placement agreement in which YCOCYF had temporary custody of A.S. and M.S. governed by 55 Pa. Code § 3130.65.

25.     Pursuant to 55 Pa. Code § 3130.65, a "voluntary" placement agreement "may not extend beyond 30 days unless a court order has been entered under 42 Pa.C.S. §§ 6341 and 6351 (relating to adjudication; and disposition of dependent child) which authorizes continued placement."

26.     On September 23, 2010, Dr. Julie Mack, a board certified pediatric radiologist employed by Hershey Medical Center, an author of recent medical journal articles on the infant dura and subdural hemorrhage and the principal researcher in pediatric neuroimaging studies at Hershey Medical Center, reported that "In summary, A.S. has isolated cortical venous thrombosis. The presence of cortical venous thrombosis explains his small subdural effusions. He also has retinal hemorrhages which are not associated with any imaging evidence of brain injury. Therefore, the retinal hemorrhages can only be considered to be the result of the cortical venous thrombosis. Such an association is supported in the literature in multiple reports, in infants and in adults.  A.S.'s presentation (possible seizure following a low velocity impact to the head) is concordant with a diagnosis of cortical venous thrombosis. His protein C deficiency may have been a contributor, and needs to be further investigated.  I hold these views to a reasonable degree of medical certainty."

27.     On September 23, 2010 Dr. Mack's report was faxed to YCOCYF and Defendant Gladfelter-Watts confirmed the receipt of the report on September 23, 2010 with counsel for the Starkey family.

28.     The "voluntary" placement agreement continued to be enforced by YCOCYF beyond September 24, 2010 in violation of 55 Pa. Code § 3130.65 and in violation of due process of law.

29.     On September 29, 2010, A.S.'s treating physician, Dr. Mark Dias, met with Dennis and Jackie.

30.     At that meeting Dr. Dias noted that A.S. had a large head and a condition known as benign extraaxial collections of infancy.  Dr. Dias stated that A.S.'s subdural hemorrhages and retinal hemorrhages could have been caused by this condition and that, although retinal hemorrhages were suspicious for abuse, Dr. Dias could not say to a reasonable degree of medical certainty that A.S.'s subdural and retinal hemorrhages were caused by abuse rather than the benign extraaxial collections of infancy condition found in A.S.

31.     Dr. Dias testified under oath that he was concerned that A.S. had a "medical condition, what's called benign extraaxial collections of infancy, and the possibility that this child actually had a subdural and retinal hemorrhages as a result of the benign extraaxial collections of infancy that [Dr. Dias] didn't feel [he] could, although [he] was suspicious that there was abuse, [he] could not get to the degree of a reasonable degree of medical certainty to feel comfortable going to court to say that, using that standard."

32.     Suspicion is a state of mind by a third party and is not medical evidence.

33.     Dr. Dias further testified that he "recommended to Children and Youth and to the detective and the attorney, the prosecuting attorney in that case, that [Dr. Dias] felt [he] could not attain that standard" of a reasonable degree of medical certainty that abuse was the cause of A.S.'s subdural and retinal hemorrhages.

34.     On October 13, 2010, Dennis and Jackie voluntarily went to the office of YCOOCF to be interviewed.  At that interview, Defendants Hedgcock and Gladfelter-Watts both confirmed that neither they nor the agency had a report from any doctor diagnosing the cause of A.S.'s injuries as abuse.

35.     On October 20, 2010, Defendant Gladfelter-Watts, with the approval of Defendant Hedgcock, reported both Dennis and Jackie as "indicated" perpetrators of abuse to the Department of Public Welfare's child abuse registry, Childline.

36.     On October 29, 2010, dependency petitions were filed alleging that A.S. and M.S. were dependent based upon the patently false allegation that A.S. "was diagnosed as a victim of Shaken Baby Syndrome."

37.     On November 2, 2010, counsel for Dennis and Jackie faxed a discovery request pursuant to Rule 1340 of the Juvenile Court Rules demanding expert reports supporting the false allegation that A.S. "was diagnosed as a victim of Shaken Baby Syndrome."

38.      YCOCYF was unable to produce any expert report or any other documentation supporting the false allegation in the dependency petition that A.S. "was diagnosed as a victim of Shaken Baby Syndrome."

39.     After YCOCYF could not produce any expert report or any other documentation supporting the false allegation in the dependency petition that A.S. "was diagnosed as a victim of Shaken Baby Syndrome" counsel for YCOCYF made it clear to counsel for Dennis and Jackie that if Dennis and Jackie returned home with their children and stopped following the "voluntary" safety plan, that YCOCYF would seek an emergency court order for custody of A.S. and M.S. to place the children in foster care.

40.     Pursuant 23 Pa.C.S. § 6335, on November 9, 2010, counsel for Dennis and Jackie petitioned the court of common pleas to release A.S. and M.S. from the "voluntary" safety plan and allow the Starkey family to be reunited.

41.     At the hearing on the Starkey family's petition to release A.S. and M.S. from the "voluntary" safety plan held on November 18, 2010, YCOCYF withdrew the dependency petition of M.S. and the court terminated the "voluntary" safety plan allowing the Starkey family to be reunited in their own home.

42.     The court continued the hearing on A.S.'s dependency petition until Monday February 28, 2011.  The purpose of the continuance was to permit time for a second consultation that Dennis and Jackie had already initiated to be completed regarding A.S.'s condition with Dr. Jessica Carpenter, M.D., a pediatric neurologist from the Children's National Medical Center in Washington, D.C.

43.     Dr. Carpenter issued a report on January 11, 2011 and, upon information and belief, Defendant Gladfelter-Watts and/or Defendant Hedgcock and/or Defendant Chronister discussed the report with Dr. Carpenter shortly after she issued her report.

44.     Dr. Carpenter reported that A.S.'s "subsequent visits with ophthalmology have demonstrated good vision and complete resolution of the retinal hemorrhages.  We have no concerns regarding his development and/or his vision today… There is no obvious evidence of trauma, i.e. no skeletal or skull fractures, bruising, scalp edema.  There is no soft tissue injury in the C-spine or injury to the cerebrum.… In the end we are left with no clear explanation for his hemorrhages.  In spite of that [A.S.]'s prognosis is good."

45.     After being told by Dr. Dias that A.S.'s subdural and retinal hemorrhages were attributable to his benign extraaxial collections of infancy, after receiving a report from Dr. Mack

that A.S. had no evidence of trauma to his head and imaging evidence of a small clot that accounted for his hemorrhages and after receiving the report by Dr. Carpenter that there was no evidence of trauma to A.S.'s head, upon information and belief on February 25, 2011, YCOCYF requested a continuance of the February 28, 2011 hearing to seek a fourth medical opinion citing that "[a]fter receiving the medical report of Dr. Carpenter – the second opinion referred to in the prior court order, it is necessary for the Agency to obtain additional medical information from an expert ophthalmologist and that information is still outstanding."

46.     On February 28, 2011 the Court denied YCOCYF's motion for a continuance and YCOCYF withdrew their dependency petition concerning A.S.

47.     On March 10, 2011, YCOCYF filed a motion of Non-pursuit with the Bureau of Hearings and Appeals stating that YCOCYF no longer intended to defend Dennis's and Jackie's appeal of the Childline "indicated" abuse report.

48.     On March 16, 2011, the Bureau of Hearings and Appeals issued an Order to expunge the reports of "indicated" abuse against Dennis and Jackie.

**COUNT I**

**YORK COUNTY, YCOCYF AND DEFENDANT CHRONISTER HAVE A POLICY OF EXTENDING VOLUNTARY PLACEMENT AGREEMENTS BEYOND 30 DAYS AND FAIL TO CONTAIN DUE PROCESS NOTICES IN VIOLATION OF PENNSYLVANIA LAW AND IN VIOLATION OF DUE PROCESS OF LAW**

49.     The allegations contained in the above numbered paragraphs are incorporated into this Count as if fully recited herein.

50.      It is well-established law that parents have a fundamental right to the care, custody and control of their children that cannot be deprived without due process, even when there is a compelling state interest to investigate allegations of child abuse.

51.     York County and/or Defendant YCOCYF and/or Defendant Chronister have a custom, practice and policy of extending voluntary placement agreements beyond 30 days in violation of Pennsylvania law and in violation of due process of law.

52.     York County and/or YCOCYF and/or Defendant Chronister have a custom, practice and policy of failing to provide notice of due process rights to parents as provided in 55 Pa. Code § 3130.65 which mandates that any voluntary placement agreement "shall contain, (1) A statement of the parents' or legal guardian's right to be represented by legal counsel or other spokesperson during conferences with the county agency about voluntary placement. (2) A statement of the parent's or legal guardian's right to refuse to place the child. (3) A statement of the parents' or legal guardian's right to visit the child, to obtain information about the child, and to be consulted about and approve medical and educational decisions concerning the child while the child is in voluntary placement.  (4) A statement of the parents' or legal guardian's right to the immediate return of the child upon request of the parent or guardian, unless the court orders the legal custody of the child to be transferred to the county agency."

53.     The very form provided by Defendant York County, Defendant YCOCYF and Defendant Chronister demonstrates a policy of failing to provide the notices required by Pennsylvania law in voluntary placement agreements because such notices are absent and lacking from the form provided by Defendant York County, Defendant YCOCYF and Defendant Chronister for voluntary placement agreements.

54.     Such mandatory notices are absent and lacking from the voluntary placement agreement prepared by Defendant Gladfelter-Watts and/or Defendant Hedgcock on the form provided by Defendant YCOCYF and entered into by the Starkey family on or about August 24, 2011.

55. The policy of the Defendant York County, Defendant YCOCYF and Defendant Chronister not to provide required notices and the policy to extend the voluntary placement agreements beyond 30 days are a direct and proximate cause of the separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants keeping Dennis and Jackie from their children in violation of due process protections against such arbitrary actions afforded under the 4th and 14th amendments of the United States Constitution and Pennsylvania law.

56. The separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants in violation of due process caused the Starkey family damages.

57. Plaintiffs' seek compensatory and punitive money damages as articulated below against Defendant York County, Defendant YCOCYF and Defendant Chronister for the period of time in violation of Pennsylvania law and constitutionally impermissible 56 days, from September 23, 2010 to November 18, 2010, during which Dennis and Jackie could not reside in their own home or be with their own children alone, and A.S. and M.S. could not be alone with their parents, as a result of the policy of the Defendants not to provide required notices and the policy to extend the voluntary placement agreements dated beyond 30 days.

## COUNT II

### DEFENDANT YORK COUNTY, DEFENDANT YCOCYF AND DEFENDANT CHRONISTER FAILED TO TRAIN EMPLOYEES ABOUT PENNSYLVANIA LAW AND THE DUE PROCESS PROTECTIONS FOR PARENTS PROVIDED FOR IN AND 4TH AND 14TH AMENDMENTS

58. The allegations contained in the above numbered paragraphs are incorporated into this Count as if fully recited herein.

59.     It is well-established law that parents have a fundamental right to the care, custody and control of their children that cannot be deprived without due process of law, and that due process of law must be afforded even when there is a compelling state interest to investigate allegations of child abuse.

60.     Pennsylvania law provides for the use of voluntary placement agreement provisions to enable county agencies that investigate allegations of child abuse to enter into agreements without court supervision while ensuring the safety of children.

61.     Pennsylvania law provides parents due process protections that, when a county agency utilizes a voluntary placement agreement, the agreement shall include notice of the right of the parent to be represented by an attorney in discussions with the agency, a right of the parent to refuse to enter into a voluntary agreement, a right of the parent to visit their child, to get information about their child and to consult in medical decisions, and a statement that the parent has a right to the immediate return of the child or children.

62.     Pennsylvania law mandates that a voluntary placement agreement "may not extend beyond 30 days" without a court order.

63.     Defendant York County, Defendant YCOCYF and Defendant Chronister failed to train its supervisor, Defendant Hedgcock, and case worker, Defendant Gladfelter-Watts, about the required due process notifications in Pennsylvania law mandating that any voluntary placement agreement contain due process notice of the parents' right to an attorney, right to refuse to enter into a placement agreement, right to information and consultation about their child while under a placement agreement and right to the immediate return of the child(ren) to the parents' care, control and custody.

64. Defendant York County, Defendant YCOCYF and Defendant Chronister failed to train its supervisor, Defendant Hedgcock, and case worker, Defendant Gladfelter-Watts, about the mandatory provisions in Pennsylvania law and due process requirements that voluntary placement agreements not extend beyond 30 days without a court order.

65. The failure of Defendant York County, Defendant YCOCYF and Defendant Chronister to train its employees in the required due process notices and mandate against extending a voluntary placement agreement beyond 30 days without a court order is a direct and proximate cause of the separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants in violation of due process protections against such arbitrary actions afforded under the 4th and 14th amendments of the United States Constitution and Pennsylvania law.

66. The separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants is violation of due process that caused the Starkey family damages.

67. Plaintiffs' seek compensatory and punitive money damages as articulated below against Defendant York County, Defendant YCOCYF and Defendant Chronister for the period of time in violation of Pennsylvania law and the constitutionally impermissible 56 days, from September 23, 2010 to November 18, 2010, during which Dennis and Jackie could not reside in their own home or be with their own children alone, and A.S. and M.S. could not be alone with their parents in their own home, as a result of the policies of the Defendants.

## COUNT III

**DEFENDANT HEDGCOCK AND DEFENDANT GLADFELTER-WATTS VIOLATED PLAINTIFFS' DUE PROCESS RIGHTS BY EXTENDING THE VOLUNTARY PLACEMENT AGREEMENT BEYOND 30 DAYS AND BY FAILING TO PROVIDE THE REQUIRED NOTICES OF RIGHT TO BE REPRESENTED, RIGHT TO REFUSE**

## PLACEMENT, RIGHT TO INFORMATION AND RIGHT TO IMMEDIATE RETURN OF THEIR CHILDREN

68.     The allegations contained in the above numbered paragraphs are incorporated into this Count as if fully recited herein.

69.     It is well-established law that parents have a fundamental right to the care, custody and control of their children that cannot be deprived without due process of law, and due process of law must be afforded even when there is a compelling state interest to investigate allegations of suspected child abuse.

70.     Defendant Hedgcock and Defendant Gladfelter-Watts knew or should have known of the due process provisions contained in Pennsylvania law concerning voluntary placement agreements that required notice in the agreement of the right for a parent to be represented in discussions about the voluntary placement agreement with the agency, the right to refuse to enter into a placement agreement, the right to information about their children during the term of the placement agreement and the right to demand the immediate return of their children.

71.     Defendant Hedgcock and Defendant Gladfelter-Watts knew or should have known of the due process provisions contained in Pennsylvania law, and required by the 14th Amendment, concerning voluntary placement agreements mandating that a voluntary placement agreement cannot be extended beyond 30 days without a court order.

72.     With deliberate indifference to the due process rights of the Starkey family, Defendant Hedgcock and Defendant Gladfelter-Watts failed to ensure that the voluntary placement agreement prepared by the Defendants on or about August 24, 2010, contained a notice of the right for a parent to be represented in discussions about the voluntary placement agreement with the agency, the right to refuse to enter into a placement agreement, the right to

information about their children during the term of the placement agreement and the right to demand the immediate return of their children.

73.     With deliberate indifference to the due process rights of the Starkey family, Defendant Hedgcock and Defendant Gladfelter-Watts extended the voluntary placement agreement for 86 days, a full 56 days beyond that permitted by Pennsylvania law and due process of law as provided in the 4th and 14th amendments of the United States Constitution.

74.     The deliberate indifference of Defendant Hedgcock and Defendant Gladfelter-Watts to the due process rights of the Starkey family in failing to provide the required notices in the voluntary placement agreement and in extending the voluntary placement agreement beyond 30 days without a court order is a direct and proximate cause of the separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants in violation of due process protections against such arbitrary actions afforded under the 4th and 14th amendments of the United States Constitution and Pennsylvania law.

75.     The separation of A.S. and M.S. from Dennis and Jackie for 86 days without any court order or court supervision over the arbitrary actions of the Defendants is violation of due process that caused the Starkey family damages.

76.     Plaintiffs' seek punitive and compensatory money damages as articulated below against Defendant Hedgcock and Defendant Gladfelter-Watts for the period of time in violation of Pennsylvania law and the constitutionally impermissible 56 days, from September 23, 2010 to November 18, 2010, during which Dennis and Jackie could not reside in their own home or be with their own children alone, and A.S. and M.S. could not be alone with their parents in their own home, as a result of the policies of the Defendants.

## COUNT IV

### DUE PROCESS CLAIM AGAINST DEFENDANT HEDGCOCK AND DEFENDANT GLADFELTER-WATTS – FOR GROSSLY NEGLIGENT INVESTIGATION AND MAKING KNOWINGLY FALSE STATEMENTS IN THE REPORT TO CHILDLINE

77.     The allegations contained in the above numbered paragraphs are incorporated into this Count as if fully recited herein.

78.     Pennsylvania law mandates that an indicated child abuse report may only be made "if an investigation by the county agency … determines that substantial evidence of the alleged abuse exists."  Pennsylvania law defines substantial evidence as "evidence that outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion."

79.     Due process of law requires that a child abuse investigation not be conducted in a grossly negligent manner.   Making a knowingly false statement in a report to Childline is grossly negligent, or worse, demonstrates a deliberate indifference to the truth and is a violation of due process.

80.     A.S. was hospitalized on August 21, 2010 and a report of suspected child abuse was immediately made to YCOCYF on or about the same day.  YCOCYF began its investigation of the presence of subdural and retinal hemorrhages in A.S. on or about August 22, 2010.

81.     Upon information and belief, Hershey Medical Center pediatric neurosurgeon Dr. Mark Dias, A.S.'s treating physician, testified under oath that he had "concerns about another medical condition, what's called benign extraaxial collections of infancy, and the possibility that this child actually had a subdural and retinal hemorrhages as a result of the benign extraaxial collections of infancy …" and that he communicated these concerns "to

Children and Youth and to the detective and the attorney, the prosecuting attorney in that case, that [Dr. Dias] felt [he] could not attain that standard [reasonable degree of medical certainty that the cause was abuse]" in A.S.'s case.

82.     Dr. Dias, A.S.'s treating physician, identified the Discharge Diagnosis for A.S. as "bilateral subdural hemorrhage" and "bilateral retinal hemorrhage."  Nowhere in Dr. Dias' discharge diagnosis, or anywhere else in A.S.'s medical records, is a diagnosis of "shaken baby syndrome" or child abuse found.

83.     Dr. Julie Mack, a board certified pediatric radiologist employed by Hershey Medical Center, an author of recent medical journal articles on the infant dura and subdural hemorrhage and the principal researcher in pediatric neuroimaging research studies at Hershey Medical Center, reported that "[i]n summary, [A.S.] has isolated cortical venous thrombosis. The presence of cortical venous thrombosis explains his small subdural effusions. He also has retinal hemorrhages which are not associated with any imaging evidence of brain injury. Therefore, the retinal hemorrhages can only be considered to be the result of the cortical venous thrombosis. Such an association is supported in the literature in multiple reports, in infants and in adults. [A.S.]'s presentation (possible seizure following a low velocity impact to the head) is concordant with a diagnosis of cortical venous thrombosis. His protein C deficiency may have been a contributor, and needs to be further investigated.  I hold these views to a reasonable degree of medical certainty."

84.     Upon information and belief, both Defendant Hedgcock and Defendant Gladfelter-Watts were fully aware of Dr. Dias' opinion and Dr. Mack's report and CV during their investigation of the report of suspected child abuse of A.S.

85. At no time during their investigation did Defendant Hedgcock or Defendant Gladfelter-Watts have substantial evidence, or any evidence at all, that A.S.'s subdural and retinal hemorrhages were caused by abuse or "shaken baby syndrome."

86. Despite substantial evidence that A.S.' subdural and retinal hemorrhages were caused by benign extraaxial collections of infancy and/or cortical venous thrombosis, and despite the complete lack of any evidence, substantial or otherwise, that A.S.'s subdural and retinal hemorrhages were caused by abuse or "shaken baby syndrome", with reckless indifference to the truth and due process of law, Defendant Hedgcock and Defendant Gladfelter-Watts made a Child Protective Service Investigative Report stating that abuse was "indicated" by the investigation, knowingly and falsely reporting that [A.S.]'s "[i]njuries could be associated with shaken baby syndrome" and falsely stating that "[b]ased on medical evidence, it appears as if abuse occurred causing the injuries" in their report to Childline on October 20, 2010.

87. Defendant Hedgcock and Defendant Gladfelter-Watts were grossly negligent in their investigation into the report of suspected child abuse of A.S. by falsely stating in their report that "based on the medical evidence" there was substantial evidence that A.S.'s subdural and retinal hemorrhages were caused by abuse when neither A.S.'s treating physician nor any other physician rendered such an opinion and when at least two doctors had rendered opinions stating that A.S.'s subdural and retinal hemorrhages were cause by benign extraaxial collections of infancy and/or cortical venous thrombosis.

88. On March 10, 2011, counsel for YCOCYF filed a motion of non-pursuit with the Department Public Welfare's Bureau of Hearings and Appeals stating that "a. Based upon the reports of medical professionals, it cannot be shown within a reasonable degree of medical certainty that A.S.'s injuries were caused by non-accidental trauma; and b. Therefore

YCOCYF cannot support the indicated finding based on medical evidence." The motion further stated, "as a result, YCOCYF is requesting that an Order of Non-Pursuit be entered and that the appeal be granted and the record expunged."

89.    Defendant Hedgcock and Defendant Gladfelter-Watts knew that the statements made in the Child Protective Service Investigative Report, statements to which each Defendant each endorsed with their signatures, that "[b]ased on medical evidence, it appears as if abuse occurred causing the injuries" with Childline on October 20, 2010 was false.

90.    Defendant Hedgcock and Defendant Gladfelter-Watts statement that "[b]ased on medical evidence, it appears as if abuse occurred causing the injuries" with Childline on October 20, 2010 constitutes an arbitrary abuse of government power in light of the information known to the Defendants that the treating physician, Dr. Dias, communicated to them that "this child actually had a subdural and retinal hemorrhages as a result of the benign extraaxial collections of infancy" and the defendants had in their possession a report and CV of a board certified pediatric radiologist with expertise in the infant dura and subdural hemorrhage, Dr. Mack, stating "the presence of cortical venous thrombosis explains his small subdural effusions. He also has retinal hemorrhages which are not associated with any imaging evidence of brain injury. Therefore, the retinal hemorrhages can only be considered to be the result of the cortical venous thrombosis"

91.    Defendant Hedgcock's and Defendant Gladfelter-Watts' false statement that "[b]ased on medical evidence, it appears as if abuse occurred causing the injuries" in their Childline report shocks the conscience and demonstrates a reckless indifference to the truth and to the due process rights of the Starkey family.

92.     The grossly negligent investigation and arbitrarily false statements made by Defendant Hedgcock and Defendant Gladfelter-Watts in the Childline report are a direct and proximate cause of the separation of A.S. and M.S. from Dennis and Jackie for 86 days in violation of due process protections against such arbitrary actions afforded under the 4th and 14th amendments of the United States Constitution and Pennsylvania law.

93.     The separation of A.S. and M.S. from Dennis and Jackie for 86 days as a result of the false statements and arbitrary actions of the Defendants is a violation of due process that caused the Starkey family damages.

94.     Plaintiffs' seek punitive and compensatory money damages as articulated below against Defendant Hedgcock and Defendant Gladfelter-Watts for the substantive due process violation of conducting a grossly negligent investigation and demonstrating a reckless indifference to the truth and to the due process rights of the Starkey family by making "indicated" reports against both Dennis and Jackie to Childline when there was no evidence whatsoever that A.S.' subdural and retinal hemorrhages were inflicted injuries and there was substantial evidence that A.S.'s were caused by benign extraaxial collections of infancy and/or cortical vein thrombosis.

**AMENDED COUNT V**

**DUE PROCESS CLAIM AGAINST DEFENDANTS YORK COUNTY, CHRONISTER, AND NIEDERER FOR HAVING A POLICY OF USING THE BEST INTEREST OF THE CHILD STANDARD AND SAFETY OF THE CHILD AS THE BASIS TO FILE AN INDICATED REPORT RATHER THAN SUBSTANTIAL EVIDENCE OF ABUSE AS REQUIRED BY PENNSYLVANIA LAW**

95.     The allegations contained in the above numbered paragraphs are incorporated into this Count as if fully recited herein.

96.     Defendant Patricia Niederer is a citizen of Pennsylvania and at all relevant times held the position of intake manager over Defendant Hedgecock, is a defendant in her capacity as intake manager.

97.     Under Pennsylvania law, an indicated child abuse report may only be made "if an investigation by the county agency … determines that substantial evidence of the alleged abuse exists" and to make a knowingly false indicated report is a violation of due process.   Pennsylvania law defines substantial evidence as evidence that outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

98.     York County, Defendant Chronister and Defendant Niederer have instituted a policy and/or custom of requiring case workers and supervisors to make "indicated" child abuse reports in what they consider to be "the best interest of the children" and for the "safety of the child" even when the investigation fails to uncover substantial evidence of abuse and such policy constitutes an arbitrary exercise of government power and a violation of Pennsylvania law and a violation of due process of law.

99.     The investigation into the report of suspected abuse failed to uncover any evidence, substantial or otherwise, that A.S.'s subdural and retinal hemorrhages were inflicted by anyone.

100.     Defendants Hedgcock, Gladfelter-Watts, Niederer and Chronister did not have "evidence which a reasonable person would accept as adequate to support a conclusion" to make an "indicated" report of child abuse against Dennis or Jackie.

101.     Defendant Hedgcock and Defendant Gladfelter-Watts did have evidence from A.S.'s treating physician, a neuro-surgeon, and from a board certified pediatric radiologist

that A.S.'s subdural and retinal hemorrhages were due to benign extraaxial collections of infancy and/or cortical vein thrombosis.

102.    Defendant Hedgcock and Defendant Gladfelter-Watts did not have any report from any doctor saying that A.S.'s subdural and retinal hemorrhages were inflicted or caused by child abuse.

103.    At a meeting on September 1, 2010 attended by Katie Glatfelter-Watts, Rebecca Wilson, Assistant District Attorney Amy Eyster, York Area Regional Police Officer Mike Zinn and Hershey medical Center Pediatrician Dr. Duda, Rebecca Wilson noted that, "Officer Mike Zinn reporting that for the most part, parents' interviews have been the same as what they reported to the hospital."

104.    According to notes in YCOCYF's file, on or about October 7, 2010, Dr. Dias told Katie Glatfelter-Watts "Benign Extra axial of [sic] collections of infancy ch[ild] has large head.  Can develop subdural from no trauma or minor injuries.  Increased spinal fluid around brain … Retcam sent out – moderate + suspicious but could be caused by other things.  Wants ch[ild] head growth chart from Ped[iatrician].  Trouble saying abuse to medical certainty …"

105.    On October 13, 2010, Katie Gladefelter-Watts emailed Dr. Dias asking him "I was wondering if you received the head measurements from the pediatrician?  We are interviewing the parents today and I just wanted to determine the medical standpoint of the case."

106.    On October 13, 2010, via email, Dr. Dias responded, "I did and it has the typical growth curve for the so-called benign extra-axial collections of infancy that we spoke about on the phone, the condition has been described in association with subdurals on rare

occasions. I remain suspicious about the possibility that this is abusive especially considering the retinal hemorrhages, although am still uncomfortable saying so to a reasonable degree of medical certainty."

107. Suspicion is not evidence.

108. On October 19, 2010 Dr. Mark Dias, A.S.'s treating physician, left a message on Defendant Hedgcock's voicemail stating, "[Dr. Dias] is having trouble achieving the status of reasonable degree of medical certainty in this case, I've [Dr. Dias] looked at the head chart which is pretty consistent with benign extracerebral fluid collections in infancy … a medical condition that can predispose to subdural hemorrhages, have talked to other people about the case and the retinal hemorrhages, felt that they were not highly suggestive of abusive head trauma, in all respects this case is disturbing to [Dr. Dias], seems very concerning for abusive head trauma but not one [Dr. Dias] is willing to go to court on and say with a reasonable degree of medical certainty couldn't have happened in a way that was consistent with an accidental mechanism … question of child having an underlying medical conditions and [Dr. Dias] can't say with assuredly [sic] that that didn't contribute to the injury and that there wasn't abuse."

109. Dr. Dias' disturbance and concern are not evidence.

110. A document produced by the Pennsylvania Department of Public Welfare file which testimony from Joyce Christian identified YCOCYS as the source of the document states the following:

INFORMATION FROM: Dr. David Turkewitz

This is a complicated case:
-       while there are suspicions of abuse
-       there is insufficient medical evidence to substantiate that abuse
-       overall, he agrees with the assessment of Dr. Dias and Dr. Dudah that they cannot

say within a reasonable degree of medical certainly - or by clear and convincing evidence that this was abuse.

Explanations of his conclusion:
-        the MRI shows a lot of chronic evidence of hematoma
-        also shows significant fluid around the brain.
-        with multiple densities
-        no evidence of acute injury to the brain

Usually hematoma w/ retinal hemorrhaging would lead to an opinion of abuse (and/or non-accidental head trauma)
-unfortunately, there are other issues which call this conclusion into doubt
-there is evidence of the benign extra-axial collections of infancy

-        on the other hand, there are no other signs of trauma and/or abuse
        -        no broken bones
        -        no acute injury shown on the MRI
        -        child recovered fully and was out to the hospital in 3 days
        -        further evidence not a severe injury

-        Dr. T did have some questions about the retinal hemorrhages
        -        as reported by both Dr. Dudah and Dr. Dias, not common to have retinal hemorrhages *w/out* trauma or abuse
        -        unfortunately, he did not see the opthalmalogist report
        -        I reviewed the statements from Dr. Dudah with him

        -        Based upon that information, Dr. T says the case for non-accidental head trauma is even weaker

Explanation of retinal hemorrhaging
-        if the blood is gathered only at the posterior pole
        -        could be accidental
-        the more the blood penetrates the layers of the retina / eye, to more to believe there is significant trauma
-        from the statements of Dr. Dudah (and the Phila specialist), these retinal hemorrhages went just beyond (not far) from the posterior pole
-        if the blood had gone through the layers (say to a level 5);
        -        could only be caused by severe auto accident, fall from significant height or shaken baby
-        do not have that in this case …

Just not enough medical evidence to show non-accidental head trauma

111.    Another document produced by the Department of Public Welfare's file

whose source was also identified by DPW employee Joyce Christian as having been produced by

Defendant YCOCYF stated the following:

INFORMATION FROM: Dr. Laura Dudah, Pediatrics – Hershey Medical Center
…

She feels very badly about this case:
-       has strong suspicion that there may have been abuse
-       but, don't have the medical evidence to support it

Explanation of benign extra-axial collections of infancy
-       there were clearly big extraaxial spaces – space between the brain and the
skull
-       some children have been shown to be more prone to subdural hematomas
        when this condition exists
-       she did acknowledge that this is an area in which medical professionals do
        have some disagreement
-       as stated in my research, not all physicians believe this hypothesis
-       child does have some of the symptoms
        -       large head
        -       steady growth
-       there are NO tests to prove conclusively whether he has this condition or
whether he is more prone to subdural hematomas

Insufficient evidence to say shaken baby - or non-accidental head trauma
-       MRI does not show acute brain injury
-       cannot say within a reasonable degree of medical certainty that this injury
        was caused by non-accidental head trauma or shaken baby
-       can't say it is abuse

Issue of Dr. Julie Mack:
-       this is not the first time she has taken a position opposite the other
        professionals at Hershey or in her department
-       the head of the radiology department does NOT agree with her assessment

However, after that happened, she and Dr. Dias decided to send the information
out
-       MRI / CT to a neuro-imaging expert in Cincinnati
-       no question about the hematoma
-       is an accumulation of blood
-       however, appears to be of different aging
-       they suggested the possibility of previous injury, with are-bleed
-       could have hit head again and caused re-bleed

- no way to tell when initial injury occurred - or what type of injury

- Retinal examination - to opthalmalagist experts in Philadelphia
- on scale of 1 - 5
- 1 being totally accidental
- 5 being strong evidence of abuse
  - these retinal hemorrhages were 2-3
  - most of the blood was gathered at the posterior pole
  - while some has gone beyond the posterior pole, not-much
- hence the low estimation of abuse

- Basically, all she can say is that there was a big bleed in the head and retinal hemorrhaging
- cannot say was cause [sic] of non-accidental trauma
- no other evidence to suspect abuse
- must consider how quickly the child recovered
  - out of hospital in 3 days
  - she has seen him for followup, doing very well
- parents have been appropriate
  - cannot say there was any evidence of lack of parenting skills etc
  - followed through with all appointments etc
  - Mother even called to ask specific questions about shaken baby
- she wanted to know how to tell if anyone shook her baby

She has spoken with Dr. Dias - as recent as this morning
- they concur on this information
- she told him that she was speaking with me
- he advised her to tell me, his opinion is the same

Overall, neither of them feel entirely comfortable with the explanation of the injury and may continue to have suspicions; however they are not willing to say in court that the medical evidence show that there is clear and convincing evidence that the injury was caused by abuse. …

112.    YCOCYF produced a document from their file authored by Katie

Gladfelter-Watts that states:

Agency received this referral on August 22, 2010 alleging the child had Subdural Hematoma And Retinal Hemorrhages, which medical staff felt were suspicious of abuse. The injuries required the child be flown from Memorial hospital to Hershey Medical Center for further cure/ treatment. Child no longer required medical care or treatment and was discharged from Hershey Medical Center on August 25, 2010. Medical staff reported that the child had serious injuries that they felt could only occur as a result of child abuse and they were willing to testify this in Court.  After the family obtained an attorney, the medical staff felt,

maybe they did miss something … They stated there was a chance that the child had a medical condition called Benign Extra Axial Collections of Infancy which means the child has a larger than normal size head and fluid collection on his brain.  If the child does have this condition, there are studies that support the child could have bumped his head, causing the Subdural Hematoma. … There is no medical documentation that states the exact cause of the injuries.  Based on the lack of concrete evidence, the Agency withdrew the dependency petition …

113.    On October 15, 2010, Katie Glatfelter-Watts left the country and was "out of the country" on October 20, 2010.

114.    On October 20, 2010, Defendant Hedgecock filed an "indicated" report of abuse to Childline on form CY-48 against Dennis and Jackie.

115.    Defendant Hedgecock signed her own name to the CY-48.

116.    Defendant Hedgecock signed Katie Glatfelter-Watts name to the CY-48.

117.    Defendant Hedgecock did not obtain consent from Katie Glatfelter-Watts to sign her name to the CY-48.

118.    Katie Glatfelter-Watts, the case worker who actually conducted the child abuse investigation, stated she "had nothing to do with that decision at that time" to file the CY-48 report with Childline of "indicted" status against Dennis and Jackie.

119.    Katie Glatfelter-Watts testified that before she left the country, on October 13, 2010, her opinion was that the report of "indicated" against Dennis and Jackie on the CY-48 "should not have been" made.

120.    Katie Glatfelter-Watts further testified that she disagreed with the statement in the CY-48 that alleged, "based on the medical evidence, it appears as if abuse occurred causing the injuries".

121.    Katie Glatfelter-Watts testified that she spoke with Defendant Hedgecock about the decision to file the "indicated" report and that Defendant Hedgecock was

"uncomfortable with the decision. But she apparently met with other people to make that determination".

122. Defendant Hedgecock testified that on the day she filed the CY-48 there was an undocumented 30 to 45 minute meeting in Deb Chronister's office with herself, Pat Niederer, Deb Chronister and possibly Carrie Ann Frolio in which it was decided to make the "indicated" report.

123. The participants of the meeting consulted Dr. Turkewitz and, while Dr. Turkewitz expressed "concern", he could not say it was a case of abuse to a reasonable degree of medical certainty.

124. Concern is not evidence.

125. Defendant Hedgecock testified that the decision to "indicate" was based on the "safety of the children" and "the best interests of the children".

126. Defendant Hedgecock testified that if Katie Glatfelter-Watts "would have been there with her higher-ups and how they and myself were making a determination, that what was in the best interest of the child, I think she would have been in agreement".

127. Rebecca Wilson testified that on or about October 19, 2010, Defendant Hedgecock consulted her regarding whether to "indicate" Dennis and Jackie Starkey on the CY-48. Defendant Wilson supported the decision to "indicate".

128. Pursuant to Pennsylvania law, "the best interest of the child" is not the standard for making an "indicated" report to Childline.

129. Pursuant to Pennsylvania law, "the safety of the child" is not the standard for making an "indicated" report to Childline.

130.     The presence and agreement of Defendant Chronister, Defendant Niederer and possibly Carrie Ann Frolio at the meeting with Defendant Hedgecock during which the determination to "indicate" Dennis and Jackie based on the purported "best interest of the child" and the purported "safety of the child" and the approval of the decision by Rebecca Wilson, renders the basis of such a determination an official practice and/or policy of York County.

131.     Defendant York County's practice and/or policy of filing "indicated" reports based on the "the best interest of the child" and "safety of the child" as perceived by employees of York County rather than based on substantial evidence, is arbitrary and capricious, a violation of Pennsylvania law and a violation of due process of law.

132.     Defendant York County's policy and/or practice of requiring that case workers and supervisors of file "indicated" reports to Childline based on the "the best interest of the child" and "safety of the child" as perceived by employees of York County rather than based on substantial evidence demonstrates a reckless indifference to the truth and to the due process rights of the Starkey family and is a direct and proximate cause of damages to the Starkey family and articulated below.

133.     Plaintiffs' seek compensatory money damages as articulated below against Defendants York County, Chronister, Niederer and Hedgecock as a result of the Defendants' policy of requiring case workers and supervisors to make "indicated" reports based on "the best interest of the child" and "safety of the child" as perceived by employees of York County rather than based on substantial evidence.

## **DAMAGES**

134.     Dennis, Jackie, A.S. and M.S. seek compensatory, punitive and other damages as the court may find appropriate for the following:

a. For the 56 days during which the voluntary placement agreement was extended beyond the 30 days permitted by Pennsylvania law and in violation of due process of law, from September 23, 2010 through November 18, 2010, that Dennis and Jackie could not live in their own home, were separated from their children A.S. and M.S. and A.S. and M.S. were separated from Dennis and Jackie.

b. For the 56 days during which the voluntary placement agreement was extended beyond the 30 days permitted by Pennsylvania law and in violation of due process, from September 23, 2010 through November 18, 2010, Dennis and Jackie were denied the custody, control and care of their children A.S. and M.S.

c. The loss of income suffered by Starkey family members to provide care for A.S. and M.S. during the time Dennis and Jackie were denied the care, custody and control of their children.

d. Dennis and Jackie incurred attorneys' fees, costs and other expenses to successfully defend the false Childline report and dependency.

e. Dennis and Jackie experienced anxiety and emotional distress as a result of their separation from their children and having to move out of their own home.

f. The false Childline report adversely impacts Dennis's and/or Jackie's ability to seek employment as an educator, daycare provider or any other occupation requiring a child abuse background check.

g. The false Childline report adversely impacts Dennis's and/or Jackie's ability to volunteer to help with children's programs at church, participate in scouting type programs, coach baseball, softball, football or any other of their children's sport's teams or participate in any activity that requires a child abuse background check.

h. A.S. and M.S. will have to live the rest of their lives, and emotionally cope, with the knowledge that their mother and father were both indicated for abusing A.S., and that they both were taken away from their parents for three months.

WHEREFORE, Plaintiffs, Dennis Starkey, Jacquelyn Starkey, M.S. and A.S. respectfully request the court enter judgment in favor of Plaintiffs and against Defendants.

Respectfully submitted,

`

/s/ Mark D. Freeman
Mark D. Freeman, Esq.
Attorney for Plaintiffs
PO Box 457
Media, PA 19063
V - 610-828-1525
F – 610-828-1769
mark@markdfreemanlaw.com

## CERTIFICATE OF SERVICE

I, Mark D. Freeman, Esquire, do hereby certify that a true and correct copy of the foregoing document was served upon Defendants' counsel, David L. Schwalm, Esquire, by the Middle District of Pennsylvania Electronic Filing system.


May 1, 2012                                    /s/ Mark D. Freeman
                                               Mark D. Freeman, Esquire
                                               Attorney for Plaintiffs